

**SIGNED this 24th day of April, 2013.**

_____
**CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-12799-CAG |
| | § | |
| TERRY CHRISTOPHER BOUNDS, | § | |
| | § | CHAPTER 7 |
| Debtor. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING CHAPTER 7 TRUSTEE'S OBJECTION AND DAVID FERNEA'S OBJECTION TO DEBTOR'S HOMESTEAD EXEMPTION UNDER 11 U.S.C. § 522(q)

Came on to be considered the Chapter 7 Trustee's Objection to Debtor's Homestead Exemption (ECF No. 53) and David Fernea's (Fernea) Objection to Debtor's State Law Exemption and Supplemental Objection (ECF Nos. 244 and 246)[1] and the Debtor's Responses thereto (ECF Nos. 258, 259 and 260). For the reasons stated herein, the Court finds the Objections meritorious and **GRANTS** Trustee's and Fernea's Objections to exemption under Section 522(q).

---

1 Fernea's Objection (ECF no. 246) involves an objection under 11 U.S.C. § 522(p). Section 522(q) objections to exemption may be filed before the closing of the case. An objection under section 522(p) must be filed within thirty days after the meeting of creditors or after any amendments to the claim of exemptions, whichever is later. Fed. R. Bankr. Proc. 4003(b)(1). Fernea argues that his objection under section 522(p) relates back to the claim of exemption under section 522(q). That is incorrect, and Fernea's objection to exemption under section 522(p) is denied.

The Court finds that it has subject matter jurisdiction under 28 U.S.C. § 1334 and that this matter is a core proceeding as defined under 28 U.S.C. § 157 (b)(2)(B) (determination of exemptions). Venue is proper under 28 U.S.C. § 1408(1). This matter is referred to this Court under the District's Standing Order of Reference. This matter is a contested matter as defined under Fed. R. Bankr. Proc. 9014, and, as such, the Court may make findings of fact and conclusions of law pursuant to Fed. R. Bankr. Proc. 7052.

## BACKGROUND

Terry Christopher Bounds (Debtor) filed a Chapter 7 petition for relief on October 5, 2009. At the time the Debtor filed his case, Debtor was a defendant in a civil case styled ***David Fernea v. Terry Christopher Bounds***, Cause No. D-1-GN-07-003874, in 250th District Court, Travis County, Texas. Fernea alleged, *inter alia*, that Debtor took certain actions involving the sale of stock to Fernea in Bounds and Pinto Marketing, Inc., and Austrends, Inc.,[2] which constituted common law fraud and violated the Texas Fraud in Stock & Real Estate Transaction statute, Tex. Bus. & Com. Code § 27.01 (West 2012).[3] Fernea maintained that the Debtor falsely promised to sell securities to Fernea and to make distributions on account of Fernea's stock

---

2 The Debtor solely owned Austrends, Inc. and Bounds and Pinto Marketing, Inc. Debtor had asked Fernea to purchase a stock ownership in both corporations. Although not dispositive of the issues in this Memorandum Opinion, Bounds filed Chapter 7 bankruptcy for both entities without Fernea's consent. The Chapter 7 petitions were subsequently dismissed.

3 Tex. Bus.& Com. Code sec. 27.01(a) (West 2009) provides that:
 Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
  (1) false representation of a past or existing material fact, when the representation is
   (A) made to a person for the purpose of inducing that person to entire into a contract; and
   (B) relied on by that person in entering that contract; or
  (2) false promise to do an act, when the false promise is
   (A) material;
   (B) made with the intention of not fulfilling it;
   (C) made to a person for the purpose of inducing that person to enter into a contract; and
   (D) relied on by that person in entering into that contract.

ownership.  Fernea also contended that the Debtor misrepresented the value of the companies being sold.  Additionally, Fernea alleged that Debtor's actions violated the Texas Securities Act and were actionable under Texas Securities Act § 33 in that the Debtor sold securities that were not registered with the Texas Securities Board even though they were subject to—and regulated by—the Texas Securities Act.

The state district court issued an Order on Plaintiff's [Fernea] Motion for Partial Summary Judgment finding as a matter of law that the sale of stocks to Fernea "involved a sale of unregistered securities" and that the sale was "not exempted from registration as a Non-issuer under 7 Texas Administrative Code § 139.14."   Thereafter, the state district court granted Fernea's partial motion for summary judgment and found as a matter of law that Debtor's sale of stock to Fernea was not exempted from registration under 7 Tex. Admin. Code §§ 139.16 and 109.13, or Tex. Rev. Civ. Stat. art. 581-5(1).

This Court granted Fernea's motion for relief from stay (ECF No. 49) to allow the state court to conduct a jury trial on the remaining allegations related to Fernea's state court petition. A jury of Bounds' peers found Bounds liable for fraud and violations of the Texas Securities Act.[4]   A certified copy of the state court judgment was filed of record in Debtor's Chapter 7 case.

In a related dischargeability action that Fernea brought under 11 U.S.C. § 523(a)(19) (Adversary No. 10-01018-CAG), this Court held that that Bounds' debt to Fernea resulted from a violation of Texas securities laws, and, was therefore not dischargeable under § 523(a)(19).  This judgment was not appealed and is now a final and enforceable for collateral estoppel purposes.

---

4 The state court Judgment consist of an unanimous jury verdict that has findings of contempt, securities law violations, fraud, actual damages, attorney's fees, theft, and exemplary damages. *See* P-1. ("P" denotes Fernea's exhibits. The Trustee relied upon Fernea's exhibits for purposes of trial).

3

A.    Texas Homestead Law

Texas residents enjoy an unlimited homestead exemption. Tex. Const., Art. XVI, § 50.  A Texas homestead cannot be subject to forced sale except for certain exceptions such as a purchase money security interest, taxes, material and mechanics liens; and until recently, home equity loans.  A lien may be fixed on a homestead for purchase money, taxes, improvements, an owelty for partition incident to a divorce decree, or the refinance of an existing lien. Tex. Prop. Code § 41.001(a) (Vernon 2000).

Additionally, Texas homestead law traces its origins to the Congress of the Republic. *See Woods v. Alvarado State Bank*, 118 Tex. 586, 19 S.W.2d 35, 36 (1929).  The Congress of the Republic of Texas passed the first homestead law in 1839 that exempted a homestead and personal property from execution. *Id*. In 1843, the Congress of the Republic exempted homestead property from sale for debts by the probate court, and set apart the property for the sole use and benefit for the widow and children of the decedent father. *Id*.  When Texas was admitted into the Union in 1845, the Texas legislature separated the exemption of the homestead from the forced sale of personal property.  Thereafter, when Texas voters approved the Texas Constitution in 1876, Article XVI, §§ 50 – 52 were enacted into law and the homestead exemption has remained relatively unchanged since 1876 but for the ability for residents to obtain home equity loans and court ordered divorce decrees to contain owelty partition provisions.

Texas homestead rights are so embedded in Texas jurisprudence that when Congress passed the 1979 Bankruptcy Code, Texas elected not to "opt out" of the Code's provision limiting debtors to using only federal exemptions. 11 U.S.C. § 522(b)(3).  The unlimited Texas homestead provision remained unchallenged under the Bankruptcy Code until Congress preempted it in 2005.

4

B.    <u>Cap on Homestead Exemption for Certain Types of Wrongdoing</u>

When Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) it included a number of controversial measures including a cap on a debtor's homestead exemption for certain violations of federal or state securities law. Passage of BAPCPA was met with heavy criticism in Congress.  Notably, a number of members of the House of Representatives, led by Representative John Conyers, found the limitations on homestead exemptions unduly burdensome on some debtors.  Representative Conyers and others noted that:

> There is also a savings clause that a debtor who owes a debt of the kind described above would not lose her homestead exemption over $125,000, to the extent that equity is reasonably necessary for the support of the debtor and any dependent of the debtor.  It is an outrage that the same "reasonably necessary standard" that would protect the unlimited homestead exemption is the same one that the drafters of the bill specifically chose to remove from the Code, in favor the means test in sec. 102 of the bill, and the IRS standards to determine a debtor's allowed expenses.

> While these amendments may eliminate a few of the abuses, they do not solve the problem.  Wealthy debtors who are able to afford skillful legal advice, and are sophisticated enough to engage in complex pre-bankruptcy planning, will, in many cases, will be able to evade the paltry restrictions in this bill.  Truly needy debtors, the kind whose life savings may be bound up in their residence, and who can afford neither sophisticated legal advice, or complex pre-bankruptcy planning, will get caught in the many twists and turns that will now be added to the Code.  Far from eliminating the abuse of the unlimited homestead exemption, this bill will have the perverse effect of perpetuating it while creating new traps for the truly needy unsophisticated debtor.

Dissenting Views of Rep. John Conyers, et al., H.R. No.109-31, Part I, p. 595-6.

Representative Conyers and others argued that although the proposed cap on homestead was to limit homestead exemptions on debtors in Texas,[5] such as Kenneth Lay of Enron, from shielding assets obtained through securities fraud, the legislation would most likely hurt those

---

5 *See* **In re Burns**, 395 B.R. 756, 763 (Bankr. M.D. Fla. 2008) (noting noted that section 522(q) was enacted to prevent debtors from shielding luxurious homes from liability under liberal state exemptions, such as those in Florida, from wrongful acts such as securities violations).

debtors with more modest homesteads and limited resources.

The Debtor attempted to capitalize on this sentiment by arguing the Congressional intent behind 11 U.S.C. § 522(q) was really to "punish" those wealthy debtors who gamed the system to disadvantage the innocent investor. Here, the Debtor argued that he really does not have any significant assets but his home, and the reality is that the only harm was to his former business partner and not a group of unknowing, unsophisticated investors. While a court is always free to consider legislative intent, particularly where the statute is less than clear, there is no ambiguity in section 522(q). Moreover, the Court finds that Congress achieved an appropriate balance between giving the debtor a fresh start – by preserving equity to the debtor of at least $136,875 *first* – before making the homestead property of the estate for equity in excess of the cap for the debtor's wrongdoing.

11 U.S.C. § 522(q) states:

(1) As a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) which exceeds in the aggregate of $146,450 if—
  (A) the court determines, after notice and a hearing, that the debtor has been convicted of a felony (as defined in section 3156 of title 18), which under the circumstances, demonstrates that the filing of the case was an abuse of the provisions of this tile; or
  (B) the debtor owes a debt arising from—
    (i) any violation of the Federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934), any State securities laws, or any regulation or order issued under Federal securities laws or States securities laws;
    (ii) fraud, deceit, or manipulation in a fiduciary capacity or in connection with the purchase or sale of any security registered under section 12 or (15(d) of the Securities Exchange Act of 1934 or under section 6 of the Securities Act of 1933;
    (iii) any civil remedy under section 1964 of title 18; or
    (iv) any criminal act, intentional tort, or willful or reckless misconduct that caused serious physical injury or death to another individual in the preceding 5 years.
(2) Paragraph (1) shall not apply to the extent the amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) is

reasonably necessary for the support of the debtor and any dependent of the debtor.

11. U.S.C. § 522(q) (West 2012).[6]  Additionally, subsection (p)(1)(A)-(D) of Section 522 describes the property subject to the $136,875 cap, and (D) specifies "real or personal property that the debtor or dependent of the debtor claims as a homestead."  The Court finds that there are four components of section 522(q) that a court must consider in deciding whether an objection to exemption should be granted.  First, the court should decide how the burden is apportioned under § 522(q).  Second, the court must consider whether there has been a violation for federal or state securities law.  Third, the court must determine if there is any equity in excess of $136,875.  Fourth, the court should determine whether the savings clause – is the homestead reasonably necessary for the support and maintenance of the debtor and his dependents – overrides making the homestead an asset of the bankruptcy estate.

## FACTS

A review of the Debtor's Schedules indicates that at the time of filing of his Chapter 7 petition, Bounds had retirement and education accounts totaling $152,000, four personal vehicles with a combined value of $24,588 (two vehicles are inoperable), other household personal property, and his homestead.  Outside the Fernea judgment claim of $2,289,349.65, Bounds does not have that many creditors in his case; he has two mortgage claims of roughly $320,000 (D[7]-25) and unsecured claims of roughly $263,000, most of which are for attorney's fees.

Debtor's non-filing spouse, Diana Bounds, operates a business – DLB Industries, which the Trustee and Fernea allege provides significant income for the support of herself and Debtor's

---

6 The amount of the cap in Section 522(q)(1) was adjusted under 11 U.S.C. § 104, effective April 1, 2010, to $146,450.  A debtor's exemptions, however, are determined on the date of petition. 11 U.S.C. § 522(b)(3)(A).  The amount of the cap on the petition date for Bounds' Chapter 7 filing was $136,875.00.

7 "D" denotes the Debtor's and Diana Bounds joint exhibits.

family.  The Bounds have three children.  Two attend college and receive scholarship assistance.  *See* P-47.  The Debtor testified that he sends his two college age children roughly $800-$990 in financial support per month, but that the majority of their college funding comes from scholarships.  The third child is a senior in high school and wishes to attend college after graduation.

The majority of the evidence the Court received from both parties concerned the appearance and value of Debtor's homestead and Mrs. Bounds purported significant business income that would arguably support the Debtor and their dependents notwithstanding the Trustee's acquisition of the homestead pursuant to section 522(q).

A.    The Debtor

The Debtor—Terry Christopher Bounds—is 49 years old and in good health.  He graduated from St. Edwards University in Austin with a BBA in finance.  Prior to being a securities advisor, he had started and operated several businesses.  He worked at Merrill Lynch as an assistant vice president for 23 years and during that time he operated Bounds and Pinto Marketing and Austrends.   The Debtor was the sole owner of the two businesses at the time he sold an ownership interest in them to David Fernea.  The Debtor stated that since Fernea obtained his state court judgment against him for securities fraud, he has not worked.  The Debtor has attempted to find work in the securities or investment field, but no one has hired him.  *See* D-13. He has looked for work at AutoZone and Wal-Mart, but has not been hired.   The Debtor had acquired a number of securities or investment licenses in connection with his prior employment at Merrill Lynch, and all of them have been revoked. *See* D-11.

The Debtor provided dismal testimony concerning his personal finances.  He is able to pay his monthly mortgage of $1,800.00 because of his wife working.  He also is paying the IRS $1,000.00 per month for delinquent taxes and pays health insurance of $600.00 per month.  *See*

D-8. He has no savings. The Debtor has exhausted both his savings and retirement accounts to pay his lawyers. He makes periodic payments on bills and attempts not to fall too far behind on payments.[8] That said, he has not rented, pledged, or encumbered his homestead. The Debtor has made no voluntary payments to Fernea nor does he anticipate making any in the near future. He has, however, given his children the following sums since bankruptcy filing: his son $6,589.61 (P-27), one daughter $9,562.51 (P-29) and his other daughter $9,064.35 (P-30).[9]

B.    Diana Bounds

Diana Bounds operates DLB Industries LLC ("DLB") in her individual capacity. The Debtor is not involved in DLB's day-to-day operations. DLB functions as an answering service and call center. DLB conducts telephone surveys and solicits resorts to hold conferences for DLB clients. DLB has roughly 14 employees; some salaried and some part time. DLB reported gross receipts of $157,655 in 2010 and $561,811 in 2011. *See* (P-21) and (P-22). DLB has reported income of $499,765 for January-October 10, 2012. Net ordinary income for the same period was $8,519.24. *See* P-23. Nonetheless, a review of Quickbooks entries for DLB over the last two years indicates that Diana Bounds was paid or reimbursed over $510,000, including checks to her totaling over $210,000. *See* P-26.

Diana Bounds testified that she incurs significant expenses in the operation of her business because she is constantly required to travel. Profit and loss records for DLB indicate that Mrs. Bounds incurred, over the course of a year, over $40,000 in gas charges and roughly $12,700.00 for meals and entertainment. *See* P-24. She stated that she earns around $60,000.00 from DLB. That said, according to the DLB corporate income tax returns (Form 1120S) and

---

8 The Debtor's joint individual income tax return filings with his wife indicate gross income for 2009-2011 in the amounts of $200,150, $151,967, and $284,592 respectively. *See* (P-18) – (P-20).

9 The Debtor testified that he attempted to mediate his dispute with Fernea three times; once before bankruptcy and twice after the petition date. Bounds also testified that he made numerous offers of settlement to Fernea.

profit and loss statements, she has grossed more than $1.2 million since Mr. Bounds filed bankruptcy. *See* (P-21) and (P-22).

The Bounds' individual income tax returns (Form 1040) for 2009-2011 indicate adjusted gross income of nearly $650,000.00. *See* (P-18) – (P-20).    This income would include withdrawals from retirement, savings, and educational accounts which the Debtor contends have been exhausted.   This income could be increased if the Debtor elected to work in his wife's business.   Mrs. Bounds stated that if her husband worked for her part time that their total income would be roughly $100,000.00.

C.    The Bounds' Homestead

The Debtor's homestead consists of 8.73 acres that includes a 4,282 square foot home, a tennis court, barn, private pond, gated entry, and is located in a desirable neighborhood within a 30 minute drive to Austin. *See* P-4. The home was originally built in the 1940's and after the Bounds purchased the home, they added onto to the existing structure.  The exterior of the home consists of stone with a metal roof.  The pond is dependent on rainfall as there is no other source of water.  Evidence was presented on what the pond looked like both with and without adequate rainfall. Notably, when the pond has water it can be used for kayaking and provides a scenic compliment to the large outdoor patio.

The value of the Debtor's homestead was subject to much debate.  The Debtor scheduled his homestead on his Schedule "A" with a value of $550,000.00.   He further indicated in his Schedule "C" that he asserted a homestead exemption in excess of the $136,875.00 cap.   In response to Fernea's request for admissions, Debtor admitted that as of the date of the admissions, Debtor's homestead value was in excess of $500,000.00.

The Debtor also testified as to his great personal attachment to his home and the sentimental aspects of raising a family there.  The Debtor stated that he and his family had lived

there since 2002. He explained that his children had grown up there and how he had incorporated personal touches such as his children's handprints into the patio that leads to the pier overlooking the pond. He explained that he hoped to use the home for the care of his parents and possibly his wife's, noting that it would fall on him to provide parental care even though there were other siblings in the family. He acknowledged that he did not need the tennis court, barn, pier, patio, or pond located on his homestead property for the maintenance of himself or his dependents. Notwithstanding his great affection for his home, Bounds stated that his home had serious defects such as a leaky roof, foundation problems, a septic system in need of repair, and that the property was located in a flood plain.[10]

The Court was provided with conflicting expert testimony as to the value of Debtor's homestead. Fernea's expert, Michael Wheeler, testified that the value of Debtor's homestead was $710,000.00, based on the comparable sales approach. *See* P-3. He reached his value by using comparable properties in the immediate area and sale over the last two years. Wheeler found the property in good shape and appeared unconcerned that part of the property is now located in a flood plain. He also indicated that notwithstanding some of the homestead's deteriorating aspects - roof coming apart, rust, cracks in the floor – that he believed that the property could be sold for well in excess of $500,000.00.

The Debtor offered two appraisers to rebut Wheeler's findings. First, the Debtor offered John Coleman to provide a critical review of Wheeler's appraisal. Coleman did not conduct his own appraisal; he simply reviewed Wheeler's appraisal. *See* D-26. Coleman found Wheeler's appraisal lacking in one essential aspect; that the foundation was damaged and that it required repairs to stabilize it. Coleman estimated the cost to stabilize the foundation to be between

---

10 When the property was originally constructed and subsequently expanded, it was not located in a flood plain. When FEMA updated it flood zone maps, part of the property, but not the home itself, was determined to be located in a flood plain.

$130,000 and $135,000, but provided no proof of what the cost to repair the slab would entail nor did he provide an engineer's report to substantiate his assertions regarding the slab's condition. Coleman also suggested that the cost of obtaining flood insurance would also negatively impact both the property's value and marketability. Finally, Coleman argued that the cracks in the walls are more significant than what Wheeler found and that Wheeler's comparables were not the functional equivalent of Debtor's homestead.

On cross-examination, a number of Coleman's findings were successfully challenged. To begin with, Coleman could not give an opinion of value because he did not prepare an appraisal. Second, as to the foundation needing significant repair, Fernea's counsel provided three appraisals (including the Debtor's) dating from late 2008 through February 2012 in which there was no indication of slab failure or the need for significant repair. *See* (D–15) – (D-17). Fernea has obtained an estimate to repair the foundation for $16,500.00. *See* P – 89.

Debtor also introduced the appraisal of Dub Smith, who had prepared an appraisal for Debtor in February 2012. *See* D-17. Smith determined the value of the property to be $530,000.00. *Id.* Unlike Wheeler, Smith is intimately familiar with the area that the property is located and has prepared appraisals for homes located in the same neighborhood as the Bounds. Also, Smith adjusted down for the cracks in the wall and that the property did not have an "open design." Smith used comparables from the same neighborhood where the property was located. Wheeler used comparables outside of Debtor's neighborhood.[11]

The Court finds Dub Smith's appraisal to be more persuasive. Smith is more familiar with the subject area and has conducted more appraisals in the area than Wheeler. Smith also

_____

11 The Debtor also offered the testimony of David Bair, a realtor, to provide testimony of what he might list the Debtor's home for sale. The Court did not find Bair's testimony probative of value, and the Court did not consider it for purposes of reaching a value determination. Moreover, because the Court has granted the Trustee's and Fernea's objections to exemptions, the Trustee may elect not to sell the property within the sale parameters that Bair discussed.

used comparables from the same neighborhood as the Bounds. The Court finds that Smith made the appropriate adjustments to value in accounting for the condition of the walls and roof. As such, the Court finds that the Debtor's homestead should be valued at $530,000.00. The Court does not need to make any additional findings as to value other than that the value of $530,000.00 exceeds the amount of the lien against the property and the applicable cap of $136,875.00.

## LEGAL ANALYSIS

A.   Which Party Has the Burden of Proof?

As an initial matter, the Court finds that the appropriate burden of proof is by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279 (1991). Courts have been uniform in finding that absent a specific burden allocated; the general presumption in bankruptcy is by a preponderance of the evidence. The Fifth Circuit has held that, "(a) claim of exemptions is presumably valid and the objecting party has the burden of proving that exemptions are not properly claimed." *Chilton v. Moser*, 674 F.3d 486, 488 (5th Cir. 2012). Further, the Circuit has held in an unpublished opinion that the burden of proving that an exemption is not "reasonably necessary" is with the objecting party. *Pequeno v. Schmidt* (*In re Pequeno*), 126 Fed.Appx. 158 (5th Cir. 2005). In the only reported case in the Circuit dealing with section 522(o), (p), and (q), the Bankruptcy Court for the Southern District of Texas found that "the objecting party … bears the ultimate burden of establishing that the Debtor's claimed homestead exemption is improper." *In re Presto*, 376 B.R. 554, 563 (Bankr. S.D. Tex. 2007). As such, the Court finds that both the Trustee and Fernea are required to prove by a preponderance of the evidence that the Debtor's claim of homestead is not valid. This would include the burden of showing that the savings clause exception is not met. *See, e.g. In re Abbott*, 466 B.R. 118, 134 (Bankr. S.D. Ohio 2012).

B.    Has There Been a Violation of Securities Law?

The Court has noted herein that the Debtor was sued for securities violations in *David Fernea v. Terry Christopher Bounds*, Cause No. D-1-GN-07-003874, in the 250th Judicial District Court of Travis County, Texas.   A jury returned a verdict of guilty for fraud and violations of the Texas Securities Act.  A certified judgment has been recorded with this Court. *See* P-1. Specifically, the jury found unanimously that the Debtor: (1) committed a securities law violation against David Fernea; and (2) committed statutory fraud.  Also, this Court found, on the basis of the same state court judgment,  that the Debtor owes a debt for securities violations under Texas law for purposes of determining a non-dischargeability action under 11 U.S.C. § 523(a)(2) and(19).   *See* P-2.   As such, the Trustee and Fernea have shown that Bounds committed a securities violation under state security law, thereby satisfying the requirements of section 522(q)(1)(B)(i).

C.    Does the Debtor Have an Interest in the Homestead Property in Excess of $136,875.00?

As an initial matter, there is no dispute that the Debtor elected state exemptions under section 522(b)(3).  *See* ECF no. 48-2 (Debtor's Schedule "C"-Property Claimed As Exempt-Amended).  The Debtor has admitted that his exemption exceeds $136,875.00.  *See* ECF no. 8, Schedule C.[12]   Further, the factual evidence recited in this Opinion is that the value of the Debtor's homestead is $530,000, which exceeds all valid encumbrances and the $136,875.00 "carve out" for the Debtor.

The Debtor suggests that, notwithstanding a finding of equity in the homestead exceeding the amount of valid encumbrances and the $136,875 carve out, that the Court must conduct an analysis to see what the remaining equity would be if the Court were to apply the costs of sale to

---

12 The Debtor is asked to check a box if the debtor claims a homestead exemption that exceeds $136,875.  The Debtor checked that box.  The Debtor also checked that box on his Amended Schedule C. *See* ECF. No. 48-2.

the homestead.  The Court finds that because the homestead property will be deemed to be property of the estate under section 522(q), the Court has the authority to allow the sale of the property as property of the estate.  *See **In re Kim***, 405 B.R. 179, 191 (Bankr. N.D. Texas 2009).  Moreover, the Court does not need to reach a precise finding of current market value in order to allow the Trustee to sell the property should he wish to do so.[13]  The Court agrees with the holding in ***In re Presto***, where the court found that:

> The Court's finding that the Debtor owes a debt arising from the conduct described in § 522(q)(1)(B) means that the Court does not need to calculate the non-exempt value of the homestead; the Debtor retains a monetary exemption in the amount of [$136,875] and any amount exceeding [$136,875] is property of the estate.

376 B.R. at 599-600.  The Trustee may sell the Debtor's homestead property and allow the Debtor to recoup $136,875.00 from the sale.

The Court also finds that the non-debtor spouse, Diana Bounds, may not assert a separate homestead exemption against the property.  The Debtor and Mrs. Bounds argue that Mrs. Bounds is entitled to assert her own homestead exemption in the property.  Further, Mrs. Bounds argues that she is entitled to her own cap, thereby doubling the exempt amount under section 522(q).  The Court finds these arguments unavailing.

The Court finds the discussion and analysis of the bankruptcy court for the Northern District of Texas instructive on this issue and adopts the reasoning of the court in ***In re Kim***, 405 B.R. 179 (Bankr. N.D. Tex. 2009).[14]  In *Kim*, the debtor's non-filing spouse claimed she was entitled to assert her own Texas homestead property in the debtor's homestead property.  The

---

13 The Court is not making any findings as to the disposition of the property.  The Court is only reaching the issue of whether the objection to exemption under section 522(q) should be sustained.  The parties may have to seek further relief from this Court regarding how the Trustee should enforce the estate's rights against the property.

14 The *Kim* case is currently on appeal with the Fifth Circuit (Case No. 10-10882), and as of the date of this Memorandum Opinion the appeal has not been resolved.  The Court, however, agrees with the reasoning of the Northern District of Texas and therefore this fact does not change the Court's analysis.

*Kim* case involved an involuntary Chapter 11 filed against the debtor for a judgment debt. At issue in *Kim* was the application of 11 U.S.C. § 522(p), the "mansion loophole" provision of section 522, wherein Congress sought to prevent a debtor from moving from one state to another state with a more generous homestead exemption and attempting to exempt the homestead from collection of a pre-existing debt. *Id.* at 186. Although *Kim* is a section 522(p) case, this Court concludes that its reasoning applies here because sections (p) and (q) of section 522 were enacted at the same time for the same reason—Congress was exercising its authority to regulate homestead exemptions through passage of BAPCPA in 2005. *Id.* (citing **Presto**, 378 B.R. at 554 ("the addition of §§ 522(o), (p), and (q) demonstrates Congress' intent to prevent states from having unlimited and unregulated homestead exemptions")).

*Kim* held that community property and jointly owned property become part of the bankruptcy estate, even if only one spouse has filed for bankruptcy. B.R. 405 at 185. Further, the court concluded that the bankruptcy estate includes:

> All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is under the sole, equal, or joint management and control of the debtor . . . . [A] petition by one spouse alone passes all such of such community property . . . to the estate.

*Id.* at 185.

The *Kim* court also recognized that although Texas homestead law gives a spouse rights in property, Section 522(q) is meant to override Texas law. The court specifically held that "it is the federal Bankruptcy law and not Texas state law that ultimately controls." *Id.* Section 522 determines what property a debtor may exempt. *Id.* (citations omitted). Moreover, the *Kim* court noted that it is federal bankruptcy law that gives a debtor the power to exempt property from the estate, gives the states the power to opt out of the federal exemption scheme, and determines applicable law under section 522(b)(3). *Id.* at 186. Further, the *Kim* court observed that

16

BAPCPA represented a "sea change" regarding state law exemptions with the consequence being that bankruptcy law dictates how state law exemptions apply or if they are applied. *Id.*; *see also In re Sissom*, 366 B.R. 677, 714 (Bankr. S.D. Tex. 2007).

The Court agrees with *Kim* that the non-filing spouse does not have an independent interest in the homestead so as to "stack" the cap. 405 B.R. at 188-89. Had the Bounds wished to claim a stacking of homestead exemptions, they both would have to be joint debtors. Mr. Bounds was the only person to have filed for bankruptcy, and, as such, only he may claim exemptions under section 522. Again, the Court adopts the reasoning of *Kim*:

> Only the Debtor may exempt property that has become property of the estate, which 'effectively eliminates the rights of a non-debtor spouse to manage and control community property. . . .' The Bankruptcy Code makes no provision for a non-debtor to claim an exemption from the estate . . . . There is also no provision for compensation for the non-filing spouse's property interest.

*Id.* at 187-99 (internal citations omitted).

D.     Does the Savings Clause Under Section 522(q) Preclude the Trustee and Fernea from Claiming the Homestead is Property of the Estate?

The Debtor argues that the Court's examination of the savings clause should focus on the property itself, as opposed to the value that could be obtained through a sale. The Debtor maintains that under Texas law it is the property rather than the value of the property that is protected. As such, the Debtor posits that this Court should recognize that the overriding purpose of the homestead exemption is not only to protect the home, but also to provide the head of household property to support the family. *Matter of Norris*, 413 F.3d 526, 528 (5th Cir. 2005).

The Debtor also argues that the Court should utilize the factors set out in *In re Goff*, 706 F.2d 574, 580 (5th Cir. 1983) as a rubric in determining whether the homestead in this case is reasonably necessary for the support of the Debtor and his dependents. Those factors include:

(1) age, (2) health, (3) future earnings capacity, and (4) necessary expenditures.  Additionally, the Debtor suggests that the Court include a much more expanded list of factors in determining whether the homestead should be protected under the savings clause.  Those additional factors include: (1) the debtor's present and anticipated living expenses, (2) the health of the debtor and his/her dependents, (3) debtor's job skills and education, (4) debtor's other assets, (5) debtor's ability to save for retirement, (6) the special needs of the debtor and his or her dependents, and (7) debtor's continuing financial obligations such as alimony or child support.  *See **In re Jackson***, 376 B.R. 75, 80 (Bankr. D. Conn. 2007), *aff'd*, ***Jackson v. Novak***, 593 F.3d 171 (2nd Cir. 2010).[15]

The Debtor argues that when applying the factors in *Goff* and *Jackson*, the evidence demonstrates that the Bounds' homestead should be protected under the savings clause.  The Bounds argue that section 522(q) was not intended for a debtor such as Bounds who did not buy a palatial home and bought his home prior to his business relationship with Fernea.  Further, the transaction with Fernea involved a transaction of a closely held corporation with a friend as opposed to Enron-like scandal involving fraud and manipulation of a group of stockholders.  The Debtor also contends that his living expenses exceed current income; that he has been unemployable; that he and his wife will have to care for elderly parents; that his job skills are unusable due to his losing his broker licenses; and that he has no other significant assets other than his homestead.  Finally, both of the Bounds suggest that the Court should also evaluate the "reasonably necessary" test by comparing the burden to the Bounds to the potential benefit to the estate.  Specifically, that the Bounds have lived in the home for ten years and their children grew

---

15 *Jackson* was a case under section 522(d)(11)(E) which permits an exemption for "the debtor's right to receive . . . a payment in compensation of loss of future earnings of the debtor . . . to the extent reasonably necessary for the support of the debtor and any dependent of the debtor."  As such, section 522(d)(11)(E) has a savings clause provision similar to that of section 522(q).

up in their home.  Also, the Bounds could not qualify for a mortgage for another home nor could they probably rent a home in the same school district.

The Court is mindful of what the Fifth Circuit has stated regarding the "reasonably necessary" standard as applied to debtors making claims of exemptions, particularly where it is alleged that the debtor is accumulating funds at the expense of creditors. *See* ***Carmichael v. Osherow*** (***In re Carmichael***), 100 F.3d 375, 379 (5th Cir. 1996).  In *Carmichael*, the Fifth Circuit stated that:

> Determination of the quantum that is needed for support is entrusted to the sound discretion of the bankruptcy court.  The bankruptcy court's authority and obligation to determine the extent to which funds are necessary for the support of the debtor and his dependents work as a safeguard to prevent debtors from stashing away assets in fraud of creditors, thereby ensuring that the proverbial shield cannot be used as a sword.

The Trustee and Fernea urge this Court to apply the factors discussed in *Presto*. 376 B.R. 554 (Bankr. S.D. Tex. 2007).  In doing so, the Trustee and Fernea direct this Court to one of the holdings in *Presto*, which states that the appropriate amount for the debtor, is:

> …sufficient to sustain basic needs, not related to the former status in society of the lifestyle to which he is accustomed, but taking into account the special needs of the debtor.

*Id*. at 598.

The Trustee and Fernea suggest the Court should also consider other income and exempt property of the Debtor and his wife, present and anticipated.  *Id*.  The *Presto* court also found that the court should also examine the debtor's age, health, future earnings capacity, and necessary expenditures. *Id*.

The evidence at trial supports the following facts:

(1) The Debtor and his wife have earnings of nearly $650,000 since the petition date.  *See* P-18, 19, and 20.

19

(2) Mrs. Bounds has grossed more than $1.2 million from the date of her husband's petition. *See* (P-21) and (P 22).

(3) The Debtor admitted during cross examination that if he worked for his wife part time that their combined earnings would be roughly $100,000 per year.

(4) The Bounds children receive thousands of dollars in scholarships. *See* P-47. Further, the Bounds have given their three children the aggregate sum of $25,000 since the filing of Bounds' Chapter 7 bankruptcy case. *See* P-27, 29, and 30.

(5) Mrs. Bounds has received transfers from DLB totaling $511,215.85. *See* P-26.

The Bounds' home is more than sufficient for their needs. It sits on nearly nine acres of land. It has over 4200 square feet of living space and the property has a tennis court, barn, gated entry, dock, and private pond. It has not been encumbered in any way to facilitate any distribution to creditors. Moreover, the Debtor and his wife are in good health and soon none of their children may live at home and all may be away at college. They have no special needs. Other family members may have to assist in the support of Mr. and Mrs. Bounds elderly parents. Therefore, the Court sees little reason, notwithstanding their personal attachment to their home, that the Bounds could not downsize to a smaller home, particularly with over $136,000 available to make a down payment for a smaller home. Also, the Debtor is healthy and well educated and should be able to find some work, even if not in the securities field.

Finally, the Debtor and his wife ask this Court to consider what effect losing their home will have on them. The Court would point that there is a debilitating effect on creditors. The Debtor was convicted of fraud and theft and took over $500,000 from his friend and co-business owner, David Fernea. While the savings clause does not include an examination of the effect of the Debtor's wrong doing on creditors, it is important to note that if the Court allows the Debtor to keep his homestead, creditors, including Fernea, will get nothing.

20

The Court finds that when weighing the totality of the facts as applied under the savings clause, the Trustee and Fernea have met their burden that the savings clause does not preclude the Court from finding that the exemption is proper under section 522(q).  The objecting parties have demonstrated that the Debtor and his wife have sufficient income, both present and prospective, to support themselves and their family.  The Debtor and his wife are in good health.  DLB does provide a sufficient means of support.  Further, the Court finds that the homestead is not necessary for the basic means of the Debtor and that there are suitable housing options in the Austin area to accommodate the Debtor and his family's needs.  Notwithstanding the home's purported deficiencies, the home is much more than what is needed for housing for the Debtor and wife.

## CONCLUSION

The Court finds that for the reasons stated in this Memorandum Opinion, that the Trustee's and Fernea's objections to the Debtor's claim of homestead under 11 U.S.C. § 522 (q) shall be **GRANTED.**   Fernea's objection under Section 522(p) is **DENIED.**

# # #